# TOBEROFF & ASSOCIATES, P.C.

23823 MALIBU ROAD, SUITE 50-363
MALIBU, CALIFORNIA 90265

Tel: (310) 246-3333 / Fax: (310) 246-3101
mtoberoff@toberoffandassociates.com

July 25, 2022

<u>Via CM/ECF</u>

The Honorable Lewis A. Kaplan
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

**RE:** *Marvel Characters, Inc. v. Lieber*, No. 1:21-cv-07955-LAK; *Marvel Characters, Inc. v. Ditko*, No. 1:21-cv-07957-LAK; *Marvel Characters, Inc. v. Dettwiler*, No. 1:21-cv-07959-LAK—Defendants' Motion to Compel Production of Documents

Dear Judge Kaplan:

On behalf of Defendants Lawrence D. Lieber ("Lieber"), Patrick S. Ditko ("Ditko"), and Keith A. Dettwiler ("Dettwiler") ("Defendants"), we write pursuant to Your Honor's Individual Rules of Practice to request an order compelling Plaintiff Marvel Characters, Inc. ("Marvel") to produce responsive documents in key categories relevant to the central issues in these cases.

Lieber is the renowned co-creator of superheroes, including "Thor," "Iron Man" and "Ant-Man." Dettwiler is the Executor of the estate of Donald L. Heck ("Heck"), the creator or co-creator of iconic characters including "Black Widow," "Iron Man" and "Hawkeye." Ditko is the Administrator of the estate of Stephen J. Ditko ("Steve Ditko"), the renowned comic book author best known for creating "Doctor Strange" and co-creating "Spider-Man," among others (collectively, the "Creators"). Defendants exercised their rights under the U.S. Copyright Act, 17 U.S.C. §304(c), to recover the U.S. copyright to the Creators' works ("Work(s)") by statutorily terminating their copyright transfers to Marvel from 1961 to 1976 when it purchased and first published the Works (the "Creation Period"). The termination right is arguably *the* most important authorial right in the Act, after copyright itself, as it enables authors to have some participation in the market value of their creations when it is no longer conjectural. *See* H.R. Rep. No. 94-1476, at 124 (1976).

The sole statutory exemption from termination are "works made for hire." 17 U.S.C. §304(c). Thus Marvel, like many terminated grantees, asserted in retrospect that all the Works were "made for hire," and carries the burden of proving this statutory exception. *Woods v. Bourne Co.*, 60 F.3d 978, 993 (2d Cir. 1995). In all instances, including the copyright termination context, the work-for-hire analysis is fact-intensive, requiring courts to review each Creator's individual working relationship and the true circumstances of each Work's creation. *See Urbont v. Sony Music Entm't*, 831 F.3d 80, 90 (2d Cir. 2016) ("turns on the parties' creative and financial arrangement as revealed by the record in each case.") (internal quotation marks omitted); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002) (same).

Marvel has alleged that whether a Work was "made for hire" turns on whether it was created at the "instance and expense" of Marvel's predecessor that registered the copyright to the

Work. *See e.g., Marvel Characters, Inc. v. Ditko*, No. 1:21-cv-07957-LAK, Dkt. 1, Exhibit ("Ex.") 25 ("Ditko Complaint") ¶¶ 1, 11, 22. According to Marvel, the Works were created at its "instance" because its editor had the alleged right to exercise creative control over the Creators (*Id.* ¶ 23) and at its "expense" because the Creators were paid for their Works (*Id.* ¶ 24).

Defendants propounded requests for production of documents ("RFPs") in February 2022 seeking to discover the actual circumstances of the Works' creation. Defendants naturally sought to test Marvel's revisionist theory that the Creators created all their Works as "works made for hire."[1] In the early 1960s, Marvel's comic book business consisted of just one alleged employee, Stan Lee ("Lee") and by 1966, two employees (Lee and his secretary) plus a bunch of shell companies in whose names the Works' copyrights were registered by rote. *See e.g., Ditko*, Dkt. 24 (Ex. 28) ("Ditko Counterclaims") ¶ 27. It was not the Marvel of today.

As detailed below, the RFPs sought, among other things, agreements, correspondence, and employment and payment records of Marvel's predecessor(s) regarding the Creators, Lee and/or the Works. But, while agreeing to produce documents in these critical categories, Marvel produced almost none before 1975 (i.e., for 14 of the 16-year Creation Period). Part of the problem may be (i) that Marvel often conducted only electronic searches, *not physical searches*, (ii) that poor quality old scans are not readily searchable, and (iii) that electronic searches are only as good as the universe of documents stored in electronic form and the word searches that are run. *See e.g.*, Ex. 9 at 2 (Marvel: "MCI, however, will nevertheless also agree to produce any vouchers that it identifies through electronic searches associated with the Defendant Contributors' names, but will not agree to undertake the burden to search for other vouchers."). *See Waite v. UMG Recordings, Inc.*, 2020 WL 3959185, at *3 (S.D.N.Y. July 13, 2020) (Kaplan, J.) ("[D]efendant must produce all documents and other requested discovery, *whether digitally stored or contained within the storage boxes*, relevant to its position that the 25 recording artists' works were 'made for hire.'") (emphasis added).

Since propounding their RFPs, Defendants have patiently tried to work with Marvel regarding its discovery delinquencies. Defendants sent many "meet and confer" letters and participated in numerous accommodating meet-and-confer sessions with little practical success.[2] Each time Marvel was pressed to produce documents it had agreed to produce, it dodged the issue. Marvel's reply letters contained what became its customary deflective response, the recipe for which is: (1) repeated references to *the number* of pages Marvel produced (irrespective of relevance) as alleged evidence of its exemplary performance; and (2) lengthy narratives which mischaracterize and misstate facts and feign outrage in a bid to falsely portray *Defendants* as exhausting, habitual delinquents in discovery.[3]

---

[1] Defendants' RFPs and Marvel's Responses are attached hereto as the following Exhibits: Ex. 1 (Lieber's First RFPs) and Ex. 2 (Marvel's Amended Responses thereto); Ex. 3 (Dettwiler's First RFPs) and Ex. 4 (Marvel's Amended Responses thereto); Ex. 5 (Ditko's First RFPs) and Ex. 6 (Marvel's Amended Responses thereto).

[2] The parties have held meet-and-confer sessions on March 24, April 21, May 11, and May 26, 2022. On the subject of RFPs, Defendants have sent letters on March 17 (Ex. 7), April 12 (Ex. 8), April 28 (Ex. 11), May 9 (Ex. 12), May 11 (Ex. 13), May 11-18 (Ex. 14), May 27 (Ex. 16), June 8 (Ex. 18), and June 13, 2022 (Ex. 19). Marvel responded on April 19 (Ex. 9), April 25 (Ex. 10), May 24 (Ex. 15), June 1 (Ex. 17), and June 15, 2022 (Ex. 20).

[3] *See e.g.*, Marvel July 15, 2022 letter (Ex. 21) and Defendants' July 22 Response (Ex. 22).

Marvel's deflections, mischaracterizations, and theatrics are all performed to distract and misdirect the Court's attention away from Marvel's grossly deficient production in key areas during the Creation Period. Marvel has dumped thousands of irrelevant or, at best, marginally relevant documents on Defendants while withholding those that are most critical to these cases and a proper "work for hire" analysis. The parties have reached an impasse on these discovery issues and as such, Defendants are forced to seek an order of this Court compelling Marvel's production in the relevant categories discussed below.

Marvel must not only produce the documents within its possession or custody, but also those that are within its "control." Fed. R. Civ. P. 34(a)(1); *see also Waite*, 2020 WL 3959185, at *2-3 ("A party is deemed to 'control' documents that it has the legal right or the practical ability to obtain—even where those documents are in the physical possession of non-parties."). "'Control' may also be found where an entity has 'access to' and the 'ability to obtain the documents.'" *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 147 (S.D.N.Y. 2011). "'Access' and 'ability to obtain documents' have been found where 'documents ordinarily flow freely between' parent and subsidiary." *Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 141 (E.D.N.Y. 2009), citing *Hunter Douglas, Inc. v. Comfortex Corp.*, 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999).

Each of the categories of documents described below are of the type that would naturally be within the possession or control of Marvel—a multi-billion-dollar corporation—such as contracts, employment and payment records, and tax documents. Or, at the very least, Marvel would have the practical ability to obtain these documents from its parent, subsidiaries, affiliates, or predecessors. It is also not credible for Marvel to blame its production failures on the age of responsive documents given that Marvel has been sued repeatedly on character rights issues dating as far back as 1966. *See Simon*, 310 F.3d at 283. Thus, Marvel has long known the importance of document retention concerning the authorship of Works it publishes, particularly those featuring its most famous superheroes.

### A. Marvel Must Produce Agreements with the Creators in the Creation Period.

Defendants' RFPs naturally sought all documents concerning negotiations and "Agreements" between Marvel and each Creator, with "Agreement" defined as "any contract, whether written or oral, express or implied." *See* Ex. 1 (Lieber) Nos. 1-2, 4, 31; Ex. 3 (Dettwiler) Nos. 1-2; Ex. 5 (Ditko) Nos. 1-2, 4. Marvel agreed to produce responsive documents (Ex. 2 Nos. 1-2, 4, 31; Ex. 4 Nos. 1-2; Ex. 6 Nos. 1-2, 4) but Marvel did not produce documents concerning negotiations, and the earliest agreement it produced was from 1975, omitting Agreements during the most important years of the Creation Period. The documents requested are unquestionably relevant as they would help determine the true circumstances under which the Creators sold their Works to Marvel, and shed light on Marvel's purported work-for-hire defense.

### B. Marvel Must Produce Documents Concerning Payments to the Creators and Lee in the Creation Period.

Relevant to the "expense" prong of the "instance and expense" test, Defendants' RFPs requested documents evidencing payments made to the Creators and to Lee for the Works and Marvel's contemporaneous tax treatment of those payments in the Creation Period. Ex. 1 (Lieber) Nos. 9-10, 32-35, 50; Ex. 3 (Dettwiler) Nos. 8-9, 19-20, 32; Ex. 5 (Ditko) Nos. 9-10, 21-22, 34. Marvel, however, again produced almost no payment documents dated before 1975 (aside from Heck's ledger, which Dettwiler also produced) and, specifically, failed to produce

any evidence that its predecessors-in-interest—Vista Publications, Inc., Non-Pareil Publishing Corp., Canam Publishers Sales Corp., Atlas Magazines, Inc., which registered the Works' copyrights (the "Copyright Claimants")—paid the Creators (or Lee) for their Works. This omission is critical, given that Marvel's entire work-for-hire defense is based on the Copyright Claimants' alleged payments to the Creators.

### C. Marvel Must Produce Documents Evidencing Marvel's Alleged Legal Right to Control the Creators' Creation of the Works.

Relevant to the "instance" prong of the "instance and expense" test, Defendants requested documents evidencing Marvel's purported legal right to control the *creation* of the Works by the Creators in their homes. Ex. 1 (Lieber) Nos. 6, 49; Ex. 3 (Dettwiler) Nos. 5, 31; Ex. 5 (Ditko) Nos. 6, 33, 40. But Marvel once again failed to produce responsive pre-1975 documents—yet another serious omission.

### D. Marvel Must Produce Relevant Correspondence with the Creators and Lee.

Marvel produced almost no correspondence concerning the Works from the Creation Period, notwithstanding Defendants' requests for same. Ex. 1 (Lieber) Nos. 21-22; Ex. 3 (Dettwiler) No. 14; Ex. 5 (Ditko) No. 16. As filler, Marvel produced big batches of communications having nothing to do with the central issues in these cases or the Creators' creation of the Works. Further, Marvel has produced almost none of Lee's relevant communications with Marvel or on behalf of Marvel, as requested (Ex. 1 (Lieber) No. 21) which is astounding, given that Lee worked with Marvel for nearly *80 years*.

### E. Marvel Must Produce Documents Evidencing the Creators' Working Status.

Marvel also failed to produce documents which relate to the Creators' employment by Marvel or freelance status in the Creation Period. Ex. 1 (Lieber) Nos. 7-8, 28-30; Ex. 3 (Dettwiler) Nos. 6, 16-18; Ex. 5 (Ditko) Nos. 7, 18-20. Again, the earliest documents Marvel produced are from 1975, critically omitting 14 of the 16-year Creation Period.

### F. Marvel Must Produce Plots, Scripts, or Outlines Relating to the Works.

Marvel also produced no plots, scripts, or outlines relating to the Creators' Works, as requested. Ex. 1 (Lieber) Nos. 40-41; Ex. 3 (Dettwiler) Nos. 23-24; Ex. 5 (Ditko) Nos. 25-26. Marvel's alleged provision of scripts and plot outlines to the Creators for the Works is central to Marvel's purported work-for-hire defense (Ditko Complaint ¶ 23; Ditko Counterclaims ¶¶ 38-39), yet it failed to produce a single one.

For the foregoing reasons, Defendants respectfully request an order compelling Marvel's immediate production of all non-privileged documents responsive to Defendants' RFPs detailed above.

Respectfully submitted,

*/s/ Marc Toberoff*

Marc Toberoff
Toberoff & Associates, P.C.
Attorneys for Defendants