# EXHIBIT 3

Page 1

1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK

2

    _____
3   MARVEL CHARACTERS, INC.,      )   No. 1:21-cv-7955-LAK
            Plaintiff and         )   and consolidated cases
4       Counterclaim-Defendant,  )   1:21-cv-7957-LAK and
        vs.                       )   1:21-cv-7959-LAK
5   LAWRENCE D. LIEBER,           )
            Defendant and         )
6           Counterclaimant.      )
    _____)
7   MARVEL CHARACTERS, INC.,      )
            Plaintiff and         )
8       Counterclaim-Defendant,  )
        vs.                       )
9   KEITH A. DETTWILER, in his    )
    capacity as Executor of the   )
10  Estate of Donald L. Heck,     )
            Defendant and         )
11          Counterclaimant.      )
    _____)
12  MARVEL CHARACTERS, INC.,      )
            Plaintiff and         )
13      Counterclaim-Defendant,  )
        vs.                       )
14  PATRICK S. DITKO, in his      )
    capacity as Administrator of  )
15  the Estate of Stephen J.      )
    Ditko,                        )
16          Defendant and         )
            Counterclaimant.      )
17  _____)
18        VIDEOTAPED DEPOSITION OF MARK EVANIER
19             Los Angeles, California
20            Friday, March 3, 2023
21                  Volume I
22  Reported by:
    NADIA NEWHART
23  CSR No. 8714
24
25

Page 2

```
 1        UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
   _____
 3 MARVEL CHARACTERS, INC.,    )
        Plaintiff and       )
 4      Counterclaim-Defendant, )
        vs.                 )
 5 LAWRENCE D. LIEBER,       )
        Defendant and       )  No. 1:21-cv-7955-LAK
 6      Counterclaim.       )  and consolidated cases
   _____) 1:21-cv-7957-LAK and
 7 MARVEL CHARACTERS, INC.,    )  1:21-cv-7959-LAK
        Plaintiff and       )
 8      Counterclaim-Defendant, )
        vs.                 )
 9 KEITH A. DETTWILER, in his  )
   capacity as Executor of the )
10 Estate of Donald L. Heck,   )
        Defendant and       )
11      Counterclaimant.    )
   _____
12 MARVEL CHARACTERS, INC.,    )
        Plaintiff and       )
13      Counterclaim-Defendant, )
        vs.                 )
14 PATRICK S. DITKO, in his    )
   capacity as Administrator of )
15 the Estate of Stephen J.    )
   Ditko,                   )
16      Defendant and       )
        Counterclaimant.    )
17 _____)
18
19     Videotaped deposition of MARK EVANIER,
20 Volume I, taken on behalf of Plaintiff and
21 Counterclaim-Defendant, at 1999 Avenue of the Stars,
22 8th Floor, Los Angeles, California, beginning at
23 9:37 a.m. and ending at 3:25 p.m. on Friday,
24 March 3, 2023, before NADIA NEWHART, Certified
25 Shorthand Reporter No. 8714.
```

Page 3

```
 1 APPEARANCES:
 2 For Marvel, Inc.:
 3     O'MELVENY & MYERS, LLP
 4     BY:  DANIEL M. PETROCELLI, ESQ.
 5     BY:  BRITTANY FOWLER, ESQ.
 6     BY:  Salvatore J. Cocchiaro, ESQ. (Remote)
 7     1999 Avenue of the Stars, 8th Floor
 8     Los Angeles, California 90067
 9     310-553-6700
10     dpetrocelli@omm.com
11     bfowler@omm.com
12     scocciaro@omm
13
14 For Patrick S. Ditko, in his capacity as
15 Administrator of the Estate of Stephen J. Ditko:
16     TOBEROFF & ASSOCIATES, P.C.
17     BY:  MARC TOBEROFF, ESQ.
18     23823 Malibu Road, Suite 50-363
19     Malibu, California 90265
20     310-246-3333
21     info@toberoffandassociates.com
22
23 Also Present:
24     JACOB FLORES, videographer
25     ELI BARD, Marvel in-house counsel
```

Page 4

```
 1                  INDEX
 2 WITNESS                      EXAMINATION
 3 MARK EVANIER
 4 Volume I
 5
 6      BY MR. PETROCELLI          7
 7      BY MR. TOBEROFF          202
 8      BY MR. PETROCELLI        207
 9
10
11            EXHIBITS
12 NUMBER        DESCRIPTION       PAGE
13 Exhibit 150  Expert Report of Mark Evanier;   7
14      24 pages
15
16 Exhibit 151  Expert Report of Mark Evanier    7
17      (Supplemented); 26 pages
18
19 Exhibit 152  Rebuttal Expert Report of Mark   7
20      Evanier; 17 pages
21
22 Exhibit 153  Deposition transcript of Mark    122
23      Evanier in Kirby matter dated
24      11/9/10; 48 pages
25
```

Page 5

```
 1 INDEX (Continued):
 2
 3            EXHIBITS
 4 NUMBER        DESCRIPTION       PAGE
 5 Exhibit 154  (Withdrawn)
 6
 7 Exhibit 155  Deposition transcript Mark       138
 8      Evanier in the Wolfman matter
 9      dated 10/12/99; 118 pages
10
11 Exhibit 156  The Comic Journal;               140
12      2021MARVEL-00550044; 41 pages
13
14 Exhibit 157  Expert Report of Paul            186
15      Levitz; 46 pages
16
17
18
19
20
21
22
23
24
25
```

Page 6

1    Los Angeles, California, Friday, March 3, 2023
2         9:37 a.m.
3
4        THE VIDEOGRAPHER:  This is Jacob Flores, the
5    videographer.  I represent Veritext Legal Solutions
6    in Costa Mesa, California.  I'm a California notary
7    public, number 2365264.  I am not financially
8    interested in this action, nor am I a relative or
9    employee of any attorney or any party.
10       Today's date is March 3rd, 2023.  The current
11   time on the monitor is 9:37 a.m.  We're on record.
12   This deposition is taking place at 1999 Avenue of
13   the Stars, number 800, Los Angeles, California
14   90065.  This is the video deposition of Mark Evanier
15   in the lead matter Marvel Characters, Inc., et al.,
16   versus Lawrence Lieber, et al., lead case
17   number 1:21-cv-7955-LAK.
18       Would counsel please introduce themselves for
19   the record.
20       MR. PETROCELLI:  Daniel Petrocelli for
21   Marvel.
22       MS. FOWLER:  Brittany Fowler for Marvel
23   Characters, Inc.
24       MR. TOBEROFF:  Marc Toberoff for the
25   defendants.

Page 7

1        THE VIDEOGRAPHER:  Thank you.
2        Will our court reporter please swear in our
3    witness.
4        THE REPORTER:  Please raise your right hand.
5
6             MARK EVANIER,
7    having been first duly sworn, was examined and
8         testified as follows:
9
10            EXAMINATION
11   BY MR. PETROCELLI:
12   Q   Good morning, Mr. Evanier.
13   A   Hello.
14   Q   I'd like to first wish you a belated happy
15   birthday.
16   A   Oh, you've been doing research.
17   Q   The last deposition I took in this case was
18   Larry Lieber's, and it was also the day after his --
19   after his birthday.
20   A   You have a trend going here.
21   Q   So you know you're here as an expert witness
22   for the -- the defendants in this -- in these
23   litigations?
24   A   That's what I understand, yes.
25       (Exhibit 151, Exhibit 152 and Exhibit 153

Page 8

1    were marked for identification
2    and are attached hereto.)
3    BY MR. PETROCELLI:
4    Q   Okay.  And you've prepared three reports
5    which I've marked as Exhibit 150, which is your
6    initial report; 151, a supplemental report; and 152,
7    a rebuttal report; is that correct?
8    A   That seems to be the case, yes.
9    Q   Okay.  Did you prepare the reports yourself?
10   A   Yes, I did.
11   Q   Did anybody else participate in the drafting
12   or revising or editing of the reports?
13   A   I got advice on how to prepare a report from
14   Mr. Toberoff, but I wrote the report.
15   Q   And once you wrote your first draft or any
16   draft for that matter, did anybody, such as
17   Mr. Toberoff or others, review the reports and make
18   any comments?
19   A   I don't think so.
20   Q   Suggest any revisions?
21   A   Yeah.  I -- I think I've caught spelling --
22   they caught spelling mistakes or I got the wrong
23   number on a -- like -- what -- what are they called?
24   Bates numbers?
25   Q   Yes.

Page 9

1    A   Okay.  I got the Bates number wrong on
2    something.
3    Q   And other than --
4    A   I don't know why they're called Bates
5    numbers.
6    Q   Nor do I.
7    A   All right.
8    Q   But were there any, you know, more
9    substantive revisions or suggestions made?
10   A   No, I don't think so.
11   Q   I'm not going to go through the reports
12   right -- right this moment.
13       But what do you understand you're here to
14   testify about as an expert?
15   A   That's a -- that's the toughest question you
16   can --
17       I understand that I am here because I have a
18   wealth of knowledge about the history of the comic
19   book industry and with a special emphasis on
20   Marvel Comics in the '60s and '70s and with the
21   procedures for how the comic books were created, how
22   the work was done.
23       I have a history of interviewing almost
24   everyone who worked for Marvel in a -- or -- or
25   contributed to their comics, wrote stories that they

3 (Pages 6 - 9)

Page 10

1  published or drew stories that they published,
2  almost everyone who was alive when I was becoming
3  active in the business or at comic conventions.
4      And I've written extensively and done quite a
5  few interviews and -- cases where I've been
6  interviewed and cases where I have interviewed those
7  people.
8      And so I understand that I am here to talk
9  about how the comic books were -- were produced, the
10 circumstances around them, not just Marvel, but also
11 other companies as well. I worked for a lot of
12 other companies as well. And --
13     Does that answer your question?
14  Q  In part.
15     Are you here to express any opinions
16 regarding whether the works at issue by the five
17 contributors involved in this litigation are works
18 made for hire or are not works made for hire?
19     MR. TOBEROFF: Calls for a legal conclusion.
20     THE WITNESS: I don't quite understand the
21 question.
22 BY MR. PETROCELLI:
23  Q  You do understand that this case involves
24 whether a number of works by Larry Lieber,
25 Steve Ditko, Don Heck, Don Rico and Gene Colan are

Page 11

1  or are not works made for hire?
2      Do you understand that?
3   A  I understand that, yes.
4   Q  Okay. And are you here to express an opinion
5  as to whether the works that are the subject of this
6  litigation are works made for hire or are not works
7  made for hire?
8      MR. TOBEROFF: Calls for legal conclusions.
9      THE WITNESS: Well, I'm under the impression
10 that the whole matter -- this whole matter is to
11 determine that by judges or juries or people way
12 above my -- my legal expertise. So I don't think
13 I'm here to make the conclusion the judge is
14 supposed to make.
15 BY MR. PETROCELLI:
16  Q  Okay. So you're not here, then, to render an
17 expert opinion that the works at issue here are or
18 are not works made for hire?
19     MR. TOBEROFF: Calls for legal conclusions.
20     THE WITNESS: I believe I'm here to discuss
21 the circumstances and situations under which the
22 work was generated and created. And --
23     If you can rephrase the question. I -- I
24 don't know that I --
25     MR. PETROCELLI: You can repeat the question.

Page 12

1      THE WITNESS: No, actually, rephrase. I
2  don't understand it the way you put it.
3  BY MR. PETROCELLI:
4   Q  What don't you understand about it?
5   A  I don't understand if you're asking me if I'm
6  here to -- to do the -- the job of a judge or -- or
7  even an attorney. I'm sorry. I'm not, obviously,
8  either of those things.
9      (Mr. Cocchiaro joined the proceedings remotely.)
10 BY MR. PETROCELLI:
11  Q  No. I appreciate your pointing out that
12 decisions in this case would be made by people other
13 than yourself or -- or me or Mr. Toberoff.
14  A  Yeah. All right.
15  Q  Okay. But I'm asking you, since you have
16 been retained as an expert witness, whether you're
17 rendering an opinion in this litigation that the
18 works that are the subject of this litigation are
19 works made for hire or are not works made for hire.
20     MR. TOBEROFF: Asked and answered, calls for
21 legal conclusions.
22     (Mr. Cocchiaro left the proceedings.)
23     MR. TOBEROFF: He already answered that
24 question.
25     THE WITNESS: Yeah, I -- I feel like I've

Page 13

1  answered the question to the best of my ability.
2  If -- maybe if you phrased it differently, I
3  could --
4  BY MR. PETROCELLI:
5   Q  No. Respectfully, I'd like you to try to
6  answer that question.
7      MR. TOBEROFF: Okay. Asked and answered,
8  calls for a legal conclusion.
9      You can -- you can answer again, but then
10 that's it.
11     THE WITNESS: I feel that I am here to lend
12 the expertise I have to an understanding of the
13 working situation, how the comics were created, how
14 the people were employed or not employed to do them.
15     You -- you -- you're -- you're aware that I
16 am not an attorney or a judge or anyone whose --
17 whose opinion matters.
18     I think I've answered your question, sir.
19 BY MR. PETROCELLI:
20  Q  So to be clear, then, you're not going to
21 render an opinion in this case that the works that
22 are involved in -- in this litigation are not works
23 made for hire?
24     MR. TOBEROFF: Asked and answered, calls for
25 a legal conclusion.

4 (Pages 10 - 13)

Page 14

1      You -- you can answer that.
2      THE WITNESS:  Give me a second here.  Let me
3  think about it.  I'm trying to understand --
4  BY MR. PETROCELLI:
5      Q   Sir, let me -- let me see if I can be
6  helpful, because I'm really not trying to do
7  something tricky here.  I'm just trying to find out
8  whether you're here to render the ultimate question
9  and opinion on the ultimate question that you've
10 indicated is for the judge or the jury to decide.
11     So you've explained that you're here to
12 discuss certain information and certain
13 circumstances regarding how works were created in
14 the comic book industry.  I -- I understand that.
15     A   Then you understand my answer.
16     Q   Hold on.  The issue in this case is whether
17 or not, as Marvel contends, all of the works
18 involved in this case are works for hire or, as the
19 defendants contend, none of the works here are works
20 for hire.  That's the ultimate issue in these cases.
21     And are you here to render an opinion that
22 the works are works for hire or an opinion that the
23 works are not made for hire?  That's all I'm asking.
24     MR. TOBEROFF:  Asked and -- hold on.
25     Asked and answered, calls for multiple legal

Page 15

1  conclusions.
2      You -- you can answer --
3      THE WITNESS:  I -- I am --
4      MR. TOBEROFF:  You can just answer the
5  question.
6      THE WITNESS:  -- not here -- I am not here to
7  do multiple legal conclusions.
8  BY MR. PETROCELLI:
9      Q   I didn't ask -- you know, your lawyer is
10 entitled to make objections.  It's really not your
11 job to parrot his objections in your answer.
12     This is just a very simple question.  If
13 you're not here to give an opinion to the Court that
14 the works are made for hire or not made for hire,
15 then just say so.  I'm not hearing --
16     MR. TOBEROFF:  He already did.
17 BY MR. PETROCELLI:
18     Q   -- that opinion.
19     A   I -- I think I did.
20     MR. TOBEROFF:  You can answer again.
21 BY MR. PETROCELLI:
22     Q   So what -- what is your opinion?  Are they
23 works for hire, or are they not works for hire?
24     MR. TOBEROFF:  That's -- that's another --
25 that's a different question.  You asked him what --

Page 16

1  BY MR. PETROCELLI:
2      Q   Answer that question.
3      A   My opinion is that I have heard so many
4  different definitions of work for hire over the
5  years, from different people, that I don't know
6  which one to follow.
7      Q   So you don't know the answer to that
8  question?
9      A   No.  I don't -- my -- my answer -- if you
10 would like to give me a definition of work for hire
11 that you think stands up to all of this, I could
12 tell you how I think my understanding of the
13 business relates to that definition.
14     But I see things called work for hire that I
15 do not believe fit my layman's understanding of work
16 for hire.
17     Q   And is that -- sticking with that, okay, your
18 layman's understanding of -- of work for hire, is it
19 your opinion that the -- that none of the works
20 involved in this litigation fit your layman's view
21 of work for hire?
22     MR. TOBEROFF:  Overbroad, lacks foundation.
23     THE WITNESS:  Do I have to --
24     MR. TOBEROFF:  Calls for legal conclusions.
25     THE WITNESS:  May I answer?

Page 17

1  BY MR. PETROCELLI:
2      Q   Yes, unless he instructs you not to answer.
3      A   Okay.  All right.
4      MR. TOBEROFF:  Wait a second.  So when I
5  object -- I'll make objections.  Unless I instruct
6  you not to answer, you can always answer.
7      THE WITNESS:  All right.
8      MR. TOBEROFF:  Just make sure you're
9  answering the question asked.
10     THE WITNESS:  It is my -- in the -- in the --
11 all right.  Let me see if I can answer it this way.
12 Maybe we can get past this.
13     I have heard the term "work for hire" bandied
14 about for years, ever since about 1978.  I never
15 heard it before then, in the entire industry.
16     And I have heard people tell me definitions,
17 including definitions from lawyers and people who
18 were in positions of responsibility at the
19 companies, that I knew were false definitions.
20     I think I have been lied to about that at
21 various times.  Or maybe "lie" is too strong a word.
22 Misled or told definitions by people who I don't
23 think had any basis for their position.
24     I'm sure you're aware that not everything
25 people in this world tell you about legal things is

5 (Pages 14 - 17)

Page 18

1   true.  I'm not talking about anything in this room.
2        I'm talking about when publishers or
3   representatives of comic book companies are dealing
4   with writers and artists and creative people who
5   have not been to law school or maybe are not well
6   informed about legal situations, they say a lot of
7   the nonsense.
8        I had a guy who was a head of a comic book
9   company once told me that a private individual could
10  never own a copyright.  It had to be in the name of
11  a corporation.  I knew that was not true.
12       So I -- I will -- you know, if -- if you're
13  asking me do I think things are work for hire, I
14  think -- I think "works" in this -- I think it is --
15  it is a very open question based on some of the
16  definitions of work for hire I've heard.
17       I -- and I have seen the relationship between
18  the publishers, the -- the management, in this case,
19  of comic book companies misrepresented.  I've seen
20  people being told me that their work is work for
21  hire when I thought there was no basis for that.
22       But -- and I've seen -- I've seen the work --
23  term "work for hire" tossed around very casually,
24  applied retroactively to work that was done before
25  anybody had heard the term "work for hire" in the

Page 19

1   industry.
2        So I -- I -- this is, to me, kind of a -- a
3   cesspool to wade into.  I don't understand some of
4   the -- I think I can't answer your question in the
5   general.  I might be able to answer in the specific,
6   in some cases.
7        But I -- I would be fascinated if apart --
8   apart from this case, someone could show me an
9   absolute definition of work for hire that was
10  inarguable and allowed someone to look at it and
11  say, well, this is work for hire and this isn't.
12       I've seen the definitions shift so much at
13  the convenience of whoever was trying to claim
14  ownership of something that I don't know what
15  standard to apply to these cases, necessarily,
16  unless you can give me a definition.
17       I'm sorry if I'm not answering your question
18  with a yes or no, but I don't understand.
19       MR. TOBEROFF:  Mark?
20       THE WITNESS:  Yeah.
21       MR. TOBEROFF:  I -- I think you -- you don't
22  have to -- you keep talking.
23       THE WITNESS:  Okay.
24       MR. TOBEROFF:  I think you should try and
25  focus on the question.  Just answer the question.

Page 20

1        THE WITNESS:  Okay.
2        MR. TOBEROFF:  And -- and --
3        THE WITNESS:  And I'm sorry.  I apologize.
4        MR. TOBEROFF:  And -- and -- no, you don't
5   have to apologize.  This isn't a popularity contest.
6   Just -- I would just try and focus and limit it to
7   the question.
8        THE WITNESS:  Okay.  I -- I am going to shut
9   up now.  Thank you.
10  BY MR. PETROCELLI:
11  Q   So in view of what you have explained, is it
12  accurate to say, then, that with respect to the
13  works specifically involved in this case, you don't
14  know one way or the other whether they are works
15  made for hire?
16  A   No, that is not what I said.
17  Q   Okay.  Well, do you know whether they were
18  works made for hire?
19       MR. TOBEROFF:  Calls for legal conclusions.
20       THE WITNESS:  I don't --  I don't --
21       MR. TOBEROFF:  That's not why he's here.
22       THE WITNESS:  I have --
23  BY MR. PETROCELLI:
24  Q   Can -- can you answer that yes or no?
25  A   No, I can't answer that yes or no.

Page 21

1   Q   You can't answer the question whether you
2   know whether these works are made for hire?
3   A   I --
4   Q   I'll follow up, whatever your answer is.  I'm
5   not going to stop there, but I'm trying to do this
6   in an orderly fashion.
7        MR. TOBEROFF:  Objection; calls for legal
8   conclusions from a layperson.
9        THE WITNESS:  I --
10  BY MR. PETROCELLI:
11  Q   Well, you presented --
12  A   I am not here to -- I am not here as an
13  attorney.
14  Q   So you're not here --
15  A   I have not been an attorney.  I don't have a
16  tie on.
17  Q   So you're not here to render an opinion
18  whether the works are made for hire, correct?
19       MR. TOBEROFF:  Asked and answered.  He
20  already said that.
21       MR. PETROCELLI:  Excuse me.  Let me rephrase
22  the question.
23  Q   You're not here, then, as an expert witness,
24  to render opinions on whether the works involved in
25  these cases are works for hire or are not works for

Page 26

BY MR. PETROCELLI:

1
2  Q  Could you take a look at Exhibit 151, just
3  to -- just to clarify this.  And just take a look at
4  the first paragraph of your --
5  A  Which --
6  Q  -- supplemented expert --
7  A  Which one are we -- which on are we talking
8  about?
9  Q  Excuse me.  We need to do a really good job
10 of not talking over each other, because our reporter
11 is going to get very upset with us, okay?
12 A  I don't want to -- I'm only really here to
13 please them.  I mean, I would like this to be -- for
14 them to be very proud.  I would like to think I'm
15 going to get an Emmy for this.
16 Q  Look at Exhibit 151.
17 A  Exhibit 151.  Yes.  Okay.  Thank you.  All
18 right.
19 Q  And look at the first paragraph.
20 A  All right.
21 Q  And --
22 A  That is the period that I believe these
23 particular works were created in, '62 to '75.
24 Q  Okay.
25 A  You asked me if this is about a period -- the

Page 27

1  larger period of -- the larger period of when --
2  Q  I didn't ask that, but that's okay.
3  A  Okay.  Okay.
4  Q  We're --
5  A  I understood the question to be about the
6  period of where the copyright laws were altered,
7  and -- and so -- and I -- and -- and --
8      MR. TOBEROFF:  Could we -- could we --
9      MR. PETROCELLI:  That was a prior question.
10     THE WITNESS:  Okay.
11     MR. PETROCELLI:  We're --
12     MR. TOBEROFF:  Dan, could we just take a
13 short break?
14     MR. PETROCELLI:  Yeah.
15     MR. TOBEROFF:  I think I just --
16     THE WITNESS:  I'm sorry.  I'm getting a
17 little -- a little disoriented here.
18     MR. TOBEROFF:  Before we get into -- I'm not
19 trying to cut you in, in the middle of questioning,
20 but I'm just trying -- I'd like to take a break.
21     MR. PETROCELLI:  Okay.
22     MR. TOBEROFF:  Just to talk to my client
23 briefly.
24     THE VIDEOGRAPHER:  The time is 10:00 a.m.
25     MR. PETROCELLI:  He's not your client.

Page 28

1      MR. TOBEROFF:  Well, for purpose -- for --
2  that's correct.
3      MR. PETROCELLI:  Or maybe he is your client.
4  I --
5      MR. TOBEROFF:  That's correct.
6      MR. PETROCELLI:  I -- I don't know.
7      THE WITNESS:  He's not -- he -- he --
8      THE VIDEOGRAPHER:  It's 10:00 a.m.  Off the
9  record.
10     (Recess.)
11     (Mr. Cocchiaro rejoined the proceedings.)
12     THE VIDEOGRAPHER:  The time is 10:06 a.m.
13 We're back on record.
14 BY MR. PETROCELLI:
15 Q  I'd like to follow up on something you said
16 in one of your prior answers in which you mentioned
17 having heard lies and misrepresentations about work
18 for hire issues.
19     Do you recall that?
20 A  Yes.
21 Q  Okay.  Did you hear any such lies or
22 misrepresentations told to you by creators?
23 A  I heard bafflement.  I heard --
24 Q  Well, my question was lies and
25 misrepresentation.

Page 29

1  A  Well, a misrepresentation is -- I've heard
2  people who were just confused and didn't know what
3  they -- when -- when -- they weren't lies because
4  the people just simply didn't know.
5  Q  Okay.  My question to you is, in all of your
6  experience, with respect to that answer that you
7  gave about lies and misrepresentations, did you ever
8  believe that a creator was lying to you about work
9  for hire?
10 A  A creator was lying to me about --
11 Q  Yes.
12     MR. TOBEROFF:  Vague, lacks foundation.
13     THE WITNESS:  There are creators who also
14 were management, and in that case, yes.
15 BY MR. PETROCELLI:
16 Q  What about creators who were not management?
17 Have you ever experienced any such person lying to
18 you about --
19 A  Lying --
20 Q  -- work for hire?
21 A  -- or -- if -- if the answer -- the question
22 is lying or misrepresentation, I can't think of one
23 at the moment.  I'm not saying it never happened.
24 Q  When you were giving that testimony, you --
25 you had in mind not creative folks, but management

8 (Pages 26 - 29)

1 or publishing people?
2     A   I had in mind people who were in positions
3 where they felt it was part of their duty to explain
4 contracts or to explain why the company was changing
5 the way they did business, representing the company.
6     Those people were also, in some cases, also
7 creators because, as you probably know, people who
8 write and draw comics sometimes wind up editing them
9 or publishing them.
10    Q   Okay.  With respect to your reports, you
11 referred to various sources of information in your
12 reports.  And I'm talking about all three of your
13 reports --
14    A   Yes.
15    Q   -- Exhibits 150, 151 and 152.
16        Are all of the sources and bases for the
17 three reports identified in the three reports?
18    A   Probably --
19        MR. TOBEROFF:  Objection; vague, overbroad.
20 BY MR. PETROCELLI:
21    Q   You can answer.
22    A   I don't know.  Do you want to point to a
23 specific one?
24    Q   I'm trying to -- you did not provide a list
25 of your -- what we call reliance materials, which is

1 a -- a list of the materials on which you relied in
2 rendering your reports.  And I'm trying to find out
3 whether the materials on which you did rely are,
4 nonetheless, all identified in your reports.
5        MR. TOBEROFF:  Objection; lacks foundation,
6 assumes facts, misstates the exhibits.
7 BY MR. PETROCELLI:
8    Q   You can answer.
9    A   Okay.  I don't think I listed every place
10 that was a source of knowledge to me about the
11 business.
12    Q   Did you --
13    A   A lot of those are personal observations and
14 personal interviews that were not recorded or
15 published.
16    Q   Did you rely on any statements or information
17 from Mr. Toberoff or his -- or other counsel in
18 rendering the reports?
19        MR. TOBEROFF:  Objection; compound.
20        THE WITNESS:  All right.  Compound.
21    What's the first part again?
22 BY MR. PETROCELLI:
23    Q   Really, these objections are for the judge.
24    A   I -- I understand that.  I understand that.
25    Q   You're just supposed to answer my question --

1    A   Okay.
2    Q   -- unless he tells you not to.
3    A   All right.
4        MR. TOBEROFF:  Wait -- wait a second.
5    So I'm --
6    (Simultaneous speaking - unreportable.)
7        MR. TOBEROFF:  As you understand, I object --
8 can object as to the form of the question, make
9 other objections.  But you can answer the question
10 unless I instruct you, but I would not state my
11 objections.  That's for me.
12        THE WITNESS:  Okay.  Thank you.  I'm sorry.
13        MR. TOBEROFF:  That's okay.
14        THE WITNESS:  Could I have the question
15 again.
16        MR. PETROCELLI:  Please.
17    (Record read as follows:
18 "Q:  Did you rely on any statements
19    or information from Mr. Toberoff or
20    his -- or other counsel in rendering
21    the reports?")
22        MR. TOBEROFF:  Objection; compound.
23        THE WITNESS:  All right.  Did I rely on any
24 statements from Mr. Toberoff?  No.  I relied -- the
25 answer is no.

1 BY MR. PETROCELLI:
2    Q   Did you receive any documents from
3 Mr. Toberoff on which you relied in writing the
4 reports?
5    A   Yes, I did.
6    Q   What documents?
7    A   He sent me a list -- quite a -- there's a
8 list of them.  I wish I -- if I had my computer in
9 front of me, it would be easier to do -- in front of
10 me, it would be easier.
11        He gave me declarations from past lawsuits,
12 for example, a declaration by Gene Colan, a
13 declaration by Don Heck, I believe, and such.
14        He gave me some interviews that were done
15 with various people.  Roy Thomas, interview with
16 Roy Thomas -- a couple of interviews with Roy
17 Thomas.
18        He gave me a -- an Avengers plot that Roy
19 Thomas produced -- or I don't where -- I don't know
20 who produced it.
21        He gave me a -- let me see.  It was quite a
22 pile of things, some of which I already had, some
23 interviews, some interviews in the Alter Ego
24 magazine.
25        He gave me Paul Levitz's expert report and, I

Page 46

1 a company called DePatie–Freleng, and Marvel
2 Productions -- Marvel's animation company was kind
3 of formed out of the wreckage of that company.
4    Q   What was the name of the company?
5    A   The company was called DePatie-Freleng,
6 D-e-P-a-i -- D-e-P-a-t-i-e, hyphen, F-r-e-l-e-n-g.
7       (Mr. Bard joined the proceedings remotely.)
8 BY MR. PETROCELLI:
9    Q   Have you testified in any other proceedings
10 than the ones that you have identified, either as an
11 expert witness or a fact witness?
12    A   Are you counting depositions?
13    Q   Yes.
14    A   I testified -- I gave a deposition in a
15 lease -- lawsuit around 1976 or '77 for the
16 Edgar Rice Burroughs estate.  It was a lawsuit where
17 they had fired or dismissed the president of the
18 company, and he was suing them for wrongful
19 termination.
20    Q   Okay.  All right.  Any others?
21    A   I'm going to answer I don't think so.
22    Q   Now, you indicated that insofar as the
23 Siegel, Wolfman, Kirby, in this case, all those four
24 cases, that you are uncomfortable or were
25 uncomfortable seeking compensation.

Page 47

1       Why is that?
2    A   Well, all of those cases involve creators who
3 I either knew or had great respect for who, in
4 some cases, I felt had been wronged and --
5       Are you looking for a short answer for this
6 or -- or --
7    Q   Well, I --
8    A   -- or a long one or --
9    Q   I don't want you to go on needlessly long
10 because we have, you know, a certain amount of time
11 today --
12    A   That's why I'm asking.
13    Q   -- but I would like you to try to be
14 responsive, within reason --
15    A   Okay.
16    Q   -- in terms of length of your answer.
17    A   Okay.  I'll do my best.
18       MR. PETROCELLI:  Where -- where did he leave
19 off?  Can you read what he said so far?
20       So you can pick it up from there.
21       (Record read.)
22       THE WITNESS:  I guess asking that means we're
23 not going to get a short answer.  All right.
24 BY MR. PETROCELLI:
25    Q   So let me just, okay, follow up briefly on

Page 48

1 that, and then I'll let you continue your answer.
2    A   Sure.
3    Q   Did you believe -- is one of the reasons
4 you're not seeking compensation in this case because
5 you believe Larry Lieber was wronged?
6       MR. TOBEROFF:  Objection as to form, lacks
7 foundation.
8       THE WITNESS:  I would say yes.
9 BY MR. PETROCELLI:
10    Q   Same question for Steve Ditko.
11    A   Probably.
12    Q   Don Heck?
13    A   Yes.
14    Q   Don Rico?
15    A   Probably, yes.
16    Q   And Gene Colan?
17    A   Yes.
18    Q   And in what way do you believe that those
19 five folks were wronged?
20    A   I believe those five folks contributed to --
21 mightily, essentially, to the creation of properties
22 that are worth billions of dollars now and that the
23 compensation that they received was a shame.
24       It was -- it was -- it makes me uncomfortable
25 that someone could lend themselves to something,

Page 49

1 the circumstances under which that work was created,
2 where it was not anticipated to be of the value --
3 or even the head of the company thought the stuff
4 was worthless, and that they ultimately received so
5 little compensation and, in some cases, a great lack
6 of respect.
7       And -- let me -- since you wanted me to
8 answer this question, I will.
9       I grew up on these comic books.  They have a
10 lot to do with me being a professional writer for
11 the last 52 years, and I have a -- certain debt to
12 them, and I feel also a certain debt to history.
13       I think that I have been fortunate enough to
14 meet most of these people, to talk with them, to
15 have access, sometimes, to information that -- that
16 satisfied -- satiated a curiosity I had about it,
17 and I feel that I have a duty to share the record
18 and set things straight sometimes when people get it
19 wrong.
20       There's a spectacular amount of
21 disinformation on the Internet, as I'm sure you
22 know.  And I've spent a lot of time doing panels
23 and -- and writing articles and things trying to
24 correct the record.  And -- yeah, so that's my
25 answer to you.

13 (Pages 46 - 49)

Page 50

1    Q   Would you agree that you are an advocate for
2    the rights of comic creators?
3        MR. TOBEROFF:  Objection; vague.
4        THE WITNESS:  I think I'm an advocate for
5    truth here.  I know that sounds corny, but, yeah,
6    I -- for -- yes, I have -- I have felt that these
7    people --
8    BY MR. PETROCELLI:
9        Q   You can answer the question, yes or no.
10       A   Yeah, the -- the -- I'm -- I'm a little fuzzy
11   on your definition of advocate here, but -- but I do
12   take their sides at times.
13       Q   No.  My question is, do you consider yourself
14   an advocate for comic creators' rights?
15       MR. TOBEROFF:  Objection as to form, vague.
16       THE WITNESS:  My answer is yes, at times.
17   BY MR. PETROCELLI:
18       Q   Okay.  And do you -- and do you remain an
19   advocate today?
20       A   Nothing has changed.
21       Q   Okay.  Now, in your prior answer, you said,
22   "The head of the company thought the stuff was
23   worthless."
24       A   Yes.
25       Q   Which company?

Page 51

1    A   Well, the company that we now know as
2    Marvel Comics.
3    Q   Okay.  And which head?
4    A   Martin Goodman.
5    Q   Okay.  What -- what stuff?
6    A   The properties that are controlled now --
7    well, the -- the properties that were created in the
8    1960s and in the '70s and probably other ones after
9    that that are now part of the Marvel universe that
10   are exploited in motion pictures and merchandising
11   and -- and, you know, many places.  The -- the
12   characters, obviously, have an enormous value.
13   Q   Did he personally tell you that?
14   A   Did Martin Goodman tell me that --
15   Q   Yeah.
16   A   -- personally?  No.
17   Q   Okay.  In fact, you only met him once in
18   passing?
19   A   I met him briefly.
20       MR. TOBEROFF:  Object- -- excuse me.
21       Objection as to form.
22       THE WITNESS:  Yes.  I met Mr. Goodman once in
23   passing.  I also knew his son.
24   BY MR. PETROCELLI:
25   Q   Chip Goodman, right?

Page 52

1    A   Charles.  I -- I knew him as Charles.
2    Q   Charles?  Okay.
3    A   I have trouble calling a grown man Chip.
4    Q   Who -- did anybody tell you that
5    Martin Goodman said the contributions of these five
6    contributors involved in this case were worthless?
7    A   Okay.  I'm exaggerating with the word
8    "worthless."  Obviously, they were worth to him, at
9    the time, to publish those comics, which he profited
10   from.
11       It is a virtual unanimous opinion of people
12   I've dealt with who worked for Marvel briefly in the
13   '60s that Mr. Goodman did not appreciate the value
14   of the material, that he thought it was going to --
15   you know, the -- the history of Marvel Comics -- and
16   I know you aren't interested in certain amounts of
17   this, but --
18   Q   Yeah.
19   A   -- I have --
20   Q   We have to keep --
21   A   -- I have to say it to -- just to -- to
22   answer your question, was that they published war
23   comics for a while, and then when those went out of
24   fad, they published love comics for a while.  When
25   those went out, they published westerns, and -- they

Page 53

1    just kept jumping on trends.
2        And every single person I think I ever talked
3    to who talked about working -- or selling stuff to
4    Marvel in the '60s said Martin's always thought it
5    was just a fad that would just last for a
6    short period of time.
7        And when he finally got an offer to sell
8    Marvel, he sold it for way, way below what he
9    thought it was -- what -- what anybody would
10   reasonably now say it was worth.
11   Q   Did you have direct conversations with any
12   of -- Lieber, Ditko, Heck, Rico or Colan on that
13   subject?
14   A   Probably.
15   Q   And they told you what you just explained to
16   me?
17   A   If you want to go specifically one by one,
18   Larry Lieber certainly said that to me.
19   Q   And said that Mr. Goodman did not appreciate
20   his work?
21   A   Yes.
22   Q   Okay.
23   A   Well, no, no, that's not what -- you're --
24   you're -- I said he did not value the work
25   sufficiently.

14 (Pages 50 - 53)

1  Q  You mean he didn't pay him enough?
2  A  Well, I think he didn't pay him enough.
3  Q  Well --
4  A  I think all these guys -- I think all these
5  people were not paid enough.
6  Q  We're -- we're talking about the payment at
7  the time they rendered the -- the service.
8       MR. TOBEROFF:  Objection as to form.
9  BY MR. PETROCELLI:
10  Q  I'm trying to understand what you're saying.
11  A  I'm -- I'm --
12  Q  Let me --
13  A  All right.  All right.
14  Q  Let me try to set this up --
15  A  All right.
16  Q  -- a little bit.
17       Are you saying that at the time that they
18  rendered the service, created these contributions
19  and were paid on a per-page rate?
20  A  Yes.
21  Q  Are you saying that that rate was too low at
22  that time?
23       MR. TOBEROFF:  Objection as to form.
24       THE WITNESS:  Okay.  I believe it was.
25  BY MR. PETROCELLI:

1  Q  Okay.  Are -- you do understand they agreed
2  to accept that rate at that time, right?
3       MR. TOBEROFF:  Objection as to form.
4       THE WITNESS:  I understand that, yes.
5  BY MR. PETROCELLI:
6  Q  Okay.  Besides having a view that their rates
7  were too low at that time, do you have some other
8  view as to they're being undercompensated?
9       MR. TOBEROFF:  Objection as to form.
10       THE WITNESS:  Yes.  I --
11  BY MR. PETROCELLI:
12  Q  What -- what is that view?
13  A  All right.  I believe that Marvel reprinted
14  that work over and over without paying them
15  additional money.  I believe in the case of
16  Mr. Colan, Mr. Heck, Mr. Lieb- -- well, actually
17  probably all of them.
18       I'm not sure about Mr. Rico -- well, yes, and
19  even Mr. Rico, the work was adapted into television
20  scripts and cartoons without compensation or, in
21  some cases, credit to them.
22       I believe that their artwork -- that the
23  artwork of those who drew was reprinted on toys and
24  merchandise without them being compensated.  I
25  believe that the -- and that they were, at the time,

1  paid less than even the industry norm.
2  Q  And -- and explain to me what you just said.
3       Did you understand that they had agreements
4  or contracts requiring such additional compensation?
5       MR. TOBEROFF:  Objection as to form.
6       THE WITNESS:  Would you repeat the question?
7  BY MR. PETROCELLI:
8  Q  You just indicated a number of -- of
9  instances or ways in which these contributors were
10  not paid, okay?
11       Did you understand that they were not paid
12  even though they had agreements to be so paid?
13       MR. TOBEROFF:  Objection as to form.
14       THE WITNESS:  I do not believe they had
15  agreements to be paid --
16       MR. PETROCELLI:  Okay.
17       THE WITNESS:  -- that way.
18  BY MR. PETROCELLI:
19  Q  But it's your view that even though they
20  didn't have specific agreements for such uses, they
21  should have been paid anyway?
22  A  I believe that they should have been paid
23  anyway, because the agreements that they signed may
24  not have -- let me -- let me say this right.  Give
25  me a second, please.

1       I believe that there were verbal promises
2  made to some of them that they would be paid, that
3  those verbal promises were not honored.  And I
4  believe that they believed that they were only doing
5  comic books.
6       And in some cases, I believe they -- they
7  were doing it for one-time publication.  And then
8  regardless of anything that might have been signed,
9  which I have never seen anything that gave --
10  that -- that said, you know, well, you understand
11  we may use these on television?  I think they were
12  undercompensated.
13  Q  Did anybody ever -- of these five folks, did
14  any one of them tell -- tell you that there had been
15  verbal promises made to them to pay them that had
16  been broken?
17  A  Yes.
18  Q  Who -- who told you that?
19  A  Steve Ditko.
20  Q  And what was the promise that he said was
21  made that was broken?
22  A  That if the material had another life outside
23  of the comic books, he would be compensated, that
24  something would be negotiated.
25  Q  And when did he tell you that?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 58

1    A   He told me this in June of 1970.
2    Q   Okay.  And have you written about that
3  promise in some of your writings or talks?
4    A   I'm not sure if I wrote about that.
5    Q   Why do you -- how do you happen to remember
6  that specific date?
7    A   Well, in July -- in -- in 1970, my
8  then-partner and I went to New York, and I visited
9  the offices of DC Comics and Marvel Comics and a few
10  other companies for a few days.  And I -- on that
11  trip, I spent two days with -- with Steve Ditko.
12    Q   And he -- and who did he say made the promise
13  to him?
14    A   Martin Goodman -- well, excuse me,
15  Martin Goodman through intermediaries.
16    Q   Did he say who the intermediaries were?
17    A   Stan Lee and others.
18    Q   And did he say what specific promise was
19  broken?
20    A   The specific promise was that if the
21  materials had a life outside of being published in
22  comic books the way they were being published, that
23  Martin would -- I think the term he used was take
24  care of him.  There would be additional money paid.
25    Q   So at that time, Mr. Ditko was aware that the

Page 59

1  promises had already been broken?
2    A   He said that was the reason he had stopped
3  working -- doing work with Marvel.
4    Q   Okay.  Do you know -- did you ever discuss
5  with him why he didn't bring a lawsuit?
6    A   I don't think there were any comic book
7  creators at that time who dared bring a lawsuit or
8  could afford to bring a lawsuit.
9    Q   No.  My question was, did he tell you?
10    A   No, he didn't tell me that.
11    Q   Okay.  Besides Ditko telling you about that
12  promise that he claimed was broken, as early as June
13  of 1970, are you -- did you have any other
14  conversations with either him or -- or Lieber, Heck,
15  Rico and Colan about broken promises?
16    A   Let me think.  Not with -- I don't think with
17  them.  With other people, but not with them.  Let me
18  think for a second.  Not with Larry.
19        Don Heck told me that he was promised that
20  Marvel would always buy work from -- for him -- from
21  him and that -- that, at times, that was not
22  honored.
23    Q   In what year did he tell you that?
24    A   I spoke with him -- the first time I spoke
25  with him was on the phone in late '69 or early 1970.

Page 60

1  And then I spoke with him in person in July of 1970.
2  And then we talked on the phone sporadically after
3  that, maybe once a year or twice a year.  And then I
4  talked with him at length at one convention many
5  years later.  He was -- he was --
6        Okay.  I've answered my -- that's my answer.
7    Q   Okay.  And can you be more specific as to
8  what he said the broken promise was, that he was
9  going to provide works to Marvel and then Marvel
10  refused to deal with him?
11    A   He was told me that Marvel -- he was told
12  Marvel would always be open to giving him work,
13  that -- that when he wanted to do work for -- draw
14  comics for them, they would, you know, make it
15  possible for him to submit work and to have, you
16  know -- and then there was a gap where he -- he
17  just wasn't getting it.
18    Q   Did he tell you why?
19    A   He did not know why.  Well, he -- no, he
20  didn't -- he didn't --
21    Q   Okay.
22    A   He did not understand why.
23    Q   So you mentioned conversation --
24    A   And, actually -- okay.  It's not responsive
25  to your question.  I am sorry.

Page 61

1    Q   You mentioned a conversation with Ditko and
2  then with Heck now, not with Lieber, you said.
3        By the way, have you read Larry Lieber's
4  deposition in this case?
5    A   Yes.
6    Q   Okay.  And in the Kirby case?
7        MR. TOBEROFF:  He asked --
8        THE WITNESS:  Yeah.
9        MR. TOBEROFF:  -- you if you read
10  Larry Lieber's deposition transcript in this case.
11        THE WITNESS:  Oh, no, I haven't.  No.
12  BY MR. PETROCELLI:
13    Q   You said yes.
14    A   No.  I -- I read a statement he made.  I -- I
15  read a --
16    Q   What statement?
17    A   Are we talking about -- I'm a little confused
18  here.  I'm sorry.
19    Q   Well, you answered yes to my question, and
20  then Mr. Toberoff --
21    A   I'm not -- I'm not --
22    Q   -- asked you the same question again, I guess
23  suggesting that maybe you didn't read it.
24        Did you or did you not read Larry Lieber's
25  deposition taken in this case?

16 (Pages 58 - 61)

1    MR. TOBEROFF:  You mean the transcript of his
2 deposition?
3    MR. PETROCELLI:  Well, of course I mean that.
4    MR. TOBEROFF:  Yes, but to a layman, it's not
5 clear.
6    THE WITNESS:  I read a transcript of a
7 deposition of Larry Lieber.
8 BY MR. PETROCELLI:
9    Q   Okay.  Was it the one that --
10    A   I believe it was.
11    Q   In this case?
12    A   I -- I -- I'm -- I'm getting a little
13 confused here.  I -- I --
14    Q   He also gave a deposition in the Kirby case.
15    A   That's why I'm confused, if -- if I'm
16 remembering -- which one I'm remembering.
17    Q   Whichever one it was, you read one?
18    A   I read a -- a deposition by -- a -- I read a
19 transcript of a -- of a deposition with
20 Larry Lieber.
21    Q   And did you read that recently in connection
22 with the preparation of your reports?
23    A   I read it a few weeks ago.
24    Q   Okay.  And was there anything in there that
25 you read that you thought was -- was incorrect that

1 comes to mind?
2    MR. TOBEROFF:  Objection as to form.
3    THE WITNESS:  I don't remember.
4 BY MR. PETROCELLI:
5    Q   Okay.  So did you have any conversations with
6 Don Rico about broken promises?
7    A   Yes.
8    Q   When did that happen?
9    A   I met Don first in around 1974, I'm going to
10 guess, somewhere in there.  I knew him until he
11 died.  I had so many conversations with him that I
12 can't tell you specifically when each one -- when he
13 said specific things.
14    Q   What was the broken promise that he described
15 to you?
16    A   Well, he had a very long battle with
17 Martin Goodman's company over some things he had
18 written for the non-comic magazines.  And in the
19 case of his work in the comic books then, he
20 believed that he had been promised -- I was going to
21 say work, but he wasn't hired by them.
22       He just was -- was -- they just, you know,
23 read his submissions, and -- and he felt it wasn't
24 given consideration, that they didn't want him
25 around anymore because they thought he was a

1 troublemaker.
2    Q   This is for publications other than the comic
3 books, you said?
4    A   Yes, yes.
5    Q   Okay.  And then what about Gene Colan?  Did
6 you discuss with him broken promises by Marvel?
7    A   Well, the promises that Gene Colan felt were
8 broken were broken after the period of time we're
9 talking about here.
10    Q   Promises that occurred in later years?
11    A   Yes.  Well, promises that were made at the
12 time but were broken much later.
13    Q   What was the nature of the promise that
14 Gene Colan described to you that was later broken?
15    A   Continued able to sell pages to the company.
16    Q   And did they stop working with him?
17    A   Yes.
18    Q   Okay.  You said earlier that you believe you
19 have a duty to set the record straight.
20    A   Yes, I said that, I believe.
21    Q   As one of the reasons why you're not seeking
22 compensation?
23    A   True.
24    Q   How do you want to set the record straight?
25    A   I want to put what I know, what I learned,

1 what I've heard, what I was told into the public
2 record and let -- you know, in some cases, speak for
3 people who are not here to speak for themselves.
4    Q   And you've done that a couple times already,
5 right?  At least three times, right?  Siegel,
6 Wolfman and Kirby.
7    A   I wasn't talking about -- when I said that, I
8 wasn't talking specifically about being an expert
9 witness.  I'm talking about writing articles, books,
10 correcting people on the Internet.  I do a lot of
11 correcting people on the Internet.
12    Q   When you said you have a duty to set the
13 record straight and it's for that reason that you're
14 not comfortable seeking compensation for serving as
15 an expert, do you feel that you need to set the
16 record straight as part of your expert work in this
17 case?
18    MR. TOBEROFF:  Objection as to form.
19    THE WITNESS:  Could I have that again,
20 please.
21    THE REPORTER:  Would you like me to read it
22 back?
23    MR. PETROCELLI:  Please.
24    (Record read as follows:
25    "Q:  When you said you have a duty

17 (Pages 62 - 65)

Page 66

1    to set the record straight and it's
2    for the reason that you're not
3    comfortable seeking compensation --")
4        MR. PETROCELLI: "That" reason. "And it's
5    for that reason."
6        (Record read as follows:
7        "Q: -- for that reason that you're
8        not comfortable seeking compensation
9        for serving as an expert, do you
10       feel that you need to set the record
11       straight as part of your expert work
12       in this case?")
13       MR. TOBEROFF: Objection as to form.
14       THE WITNESS: All right. I think that
15   slightly misstates my testimony. The duty to set
16   the record straight was not the whole reason that I
17   do not seek compensation.
18       Another reason is that I feel a certain -- I
19   said I feel a certain debt sometimes to these
20   people, and some of them are people that I knew and
21   felt were wronged in some way, and -- and, you
22   know...
23   BY MR. PETROCELLI:
24   Q   How do you feel that you are repaying that
25   debt by serving as an expert in this case?

Page 67

1    A   Well --
2        MR. TOBEROFF: Objection as to form.
3        THE WITNESS: -- I feel that I -- I feel that
4    I'm -- I feel that I am helping repay a debt to
5    them. Sometimes you do things in this world just
6    because you think -- you like somebody and you want
7    to speak on their behalf if you feel you have the
8    truth.
9        You know, you -- all of those people I know,
10   the -- the people that I've mentioned -- well, no,
11   let me take -- let me amend that.
12       Some of the people that I've mentioned --
13       Let me have the question one more time. I'm
14   sorry.
15       (Record read as follows:
16       "Q: How do you feel that you are
17       repaying that debt by serving as an
18       expert in this case?")
19       MR. TOBEROFF: Objection as to form.
20       THE WITNESS: If I know -- if somebody
21   publish- -- publishes a statement I believe to be
22   untrue, that misrepresents the history of comics and
23   does not give proper credit to someone, where I feel
24   I have information that would correct the record, I
25   feel I have a duty to offer it, whether I knew the

Page 68

1    person or not.
2        When people have wronged management, even, I
3    feel I have a duty to correct the record.
4        I don't think that the cause of understanding
5    the history of the industry is served by
6    dissemination of false information, and if my
7    offering of what I know, what I've heard, what I
8    believe -- what I have observed in some cases can
9    help out, that is reason enough for me to offer it,
10   in any venue.
11   BY MR. PETROCELLI:
12   Q   Are you aware of Marvel offering any false
13   information or taking false positions in this
14   litigation?
15       MR. TOBEROFF: Objection as to form.
16       THE WITNESS: I don't know -- I don't know
17   the answer to that question.
18       MR. TOBEROFF: You don't have to keep -- you
19   can -- you've answered the question.
20       THE WITNESS: I've -- I just answered my
21   question. That's my answer.
22       MR. TOBEROFF: You don't have to fill the
23   silence.
24   BY MR. PETROCELLI:
25   Q   You understand that the -- the heirs of these

Page 69

1    five gentlemen are seeking to terminate alleged
2    grants of copyrights and to recapture interest in
3    those copyrights?
4        You understand that that's the subject of
5    their termination notices?
6        MR. TOBEROFF: Objection as to form.
7        THE WITNESS: I understand that.
8    BY MR. PETROCELLI:
9    Q   And do you understand whether or not your
10   work as an expert in this case and your reports and
11   your testimony will aid the heirs in securing those
12   rights?
13       MR. TOBEROFF: Objection as to form.
14       THE WITNESS: If I am correcting the record,
15   yes.
16   BY MR. PETROCELLI:
17   Q   Did you --
18   A   Let me amend that answer. If I am correcting
19   the record, it might.
20   Q   You helped found the Comic Art Professional
21   Society?
22   A   Correct.
23   Q   And what was the -- just very generally, what
24   was the nature of that organization?
25   A   It was, basically, the social group for

18 (Pages 66 - 69)

1  Q  Okay.  Are you sure of that?
2  A  I said, "I believe."
3  Q  And you said you --
4  A  That -- that would be when I met him in the
5  hallways.
6  Q  You were introduced to him, right?
7  A  I was introduced to him, yes.
8  Q  No conversation of substance, right?
9  A  Nothing that would be germane to this case.
10  Q  Okay.  You didn't call him out for breaching
11  Steve Ditko's promise, right?
12      MR. TOBEROFF:  Objection as to form.
13      THE WITNESS:  I don't think I had met with
14  Mr. Ditko before, at the time.
15  BY MR. PETROCELLI:
16  Q  Okay.  And other than visiting the offices,
17  you never worked at Marvel's offices, right?
18  A  Not officially.
19  Q  Well, you lived in L.A., right?
20  A  Yes.
21  Q  Okay.  And Marvel's offices were in New York?
22  A  Yes.
23  Q  And you were never on staff at Marvel, right?
24  A  No.
25  Q  Correct?

1  A  I was never hired on staff at Marvel.  I did
2  some work up there in the offices, but I just
3  never -- it's -- I -- no, I was never on staff
4  there, no.
5  Q  Would you characterize your experience with
6  comic books, especially prior to 1978, being more on
7  the creative than business side?
8      MR. TOBEROFF:  Objection as to form.
9      THE WITNESS:  My involvement was creative.
10  BY MR. PETROCELLI:
11  Q  Now, in your report, you offer opinions about
12  the custom and practice in the comics industry,
13  right?
14  A  Correct.
15  Q  So you agree that there were customs and
16  practices in the comic book industry with -- with
17  respect to the creation and publication of comics?
18      MR. TOBEROFF:  Objection as to form.
19      THE WITNESS:  Some, not -- not to the extent
20  that Mr. Levitz indicated in his report.
21  BY MR. PETROCELLI:
22  Q  Have you ever testified that there were no
23  customs and practices in the comic books industry?
24      MR. TOBEROFF:  Objection as to form.
25      THE WITNESS:  Well, there is -- there are

1  customs and practices in every industry, but some of
2  them are pretty vague and --
3      I -- I don't know -- I guess I don't
4  understand the question.
5  BY MR. PETROCELLI:
6  Q  What don't you --
7  A  What -- what customs and practices are we
8  talking about?
9  Q  Well, what customs and practices are you
10  talking about in your report?
11  A  In the -- in the customs and practices I'm
12  talking about in the report, I'm talking --
13      MR. TOBEROFF:  Wait a second.
14      I -- I would like to object to the form of
15  the question, overbroad.
16      You -- you --
17      THE WITNESS:  I can answer?  Okay.
18      MR. TOBEROFF:  Dan, do you want to restate
19  your original question?
20      MR. PETROCELLI:  Yeah.
21  BY MR. PETROCELLI:
22  Q  What -- what -- is it your opinion that there
23  are customs -- that there -- there was a custom and
24  practice in the comic book industry for dealing with
25  talent?

1  A  I do not believe there was a universal custom
2  and practice for dealing with talent.
3  Q  Okay.  You -- and that's still your opinion
4  today, right?
5  A  Yes.
6  Q  Okay.  And was there a custom and practice
7  with -- with respect to some other aspect of the
8  comic book industry?
9      MR. TOBEROFF:  Objection as to form,
10  overbroad.
11      THE WITNESS:  Well, you know, they all
12  printed on cheap newsprint.  That would be a -- a
13  custom.  They all used ink.  That would be a custom.
14  They all paid as little as they could get away with
15  paying.  That would be a custom.
16      I have objected in many articles, to the
17  notion that they're all written the same way,
18  they're all drawn the same way.  I did a seminar
19  once, at a convention, about showing different ways
20  comic books can be -- have been and can be written.
21  BY MR. PETROCELLI:
22  Q  Is it your opinion that there was, during
23  these years, '62 to '75, a custom and practice in
24  the comic book industry with respect to the creation
25  of comic books?

Page 106

1    THE WITNESS: I believe the ultimate
2 responsibility was Stan Lee, but he delegated some
3 of it to Roy Thomas or Sol Brodsky or other people
4 there.
5 BY MR. PETROCELLI:
6    Q   Have you read Roy Thomas's deposition in this
7 case?
8    A   Yes, I believe I have. Yes, yes.
9    Q   Relatively recently?
10    A   Yes. Yes.
11    Q   Is there anything that comes to mind that you
12 read in that transcript of Thomas's deposition that
13 you thought was wrong?
14    A   Yes, but I can't recall at this moment what
15 it was.
16    MR. TOBEROFF: Dan? We -- we have not -- we
17 have not yet received that transcript, so that's
18 an --
19    THE WITNESS: Oh, okay.
20    MR. TOBEROFF: -- that's an -- I'm just --
21    THE WITNESS: I -- I read --
22    MR. TOBEROFF: I'll represent --
23    THE WITNESS: I read articles --
24    MR. TOBEROFF: I'll represent that -- that
25 that's --

Page 107

1 BY MR. PETROCELLI:
2    Q   Well, you imagined it?
3    A   No, no, no.
4    Q   You imagined the transcript and the error,
5 right?
6    A   I was -- I was given --
7    MR. TOBEROFF: I think he's conflating the
8 interviews and --
9    THE WITNESS: Yeah.
10    MR. TOBEROFF: -- things with --
11    THE WITNESS: No. I read interviews with
12 Mr. Thomas.
13 BY MR. PETROCELLI:
14    Q   Okay. Okay.
15    A   May -- May I add something here?  I have
16 never read an interview with Roy Thomas I didn't
17 disagree with something in, so...
18    Q   But you didn't read his deposition?
19    A   No, no, not this one, no.  No, not this.
20    Q   And for that matter, you didn't read
21 Larry Lieber's deposition in this case, either,
22 right?
23    A   I -- I guess --
24    Q   Apparently, you don't have --
25    A   I -- I guess I read his other deposition.

Page 108

1    Q   Okay.  Now, from time to time, in your
2 answers, you use the word "purchase" in -- in
3 respect of the transaction, right, between the
4 artist and Marvel; is that right?
5    A   I believe I do, yes.
6    Q   Is there some significance in your mind to
7 the use of the word "purchase" or "sell"?
8    MR. TOBEROFF: Objection as to form.
9 BY MR. PETROCELLI:
10    Q   In terms of your expert opinion and
11 testimony you're giving in this case, is there
12 some particular significance to the use of
13 "purchase" and "sell" in your testimony?
14    MR. TOBEROFF: Objection as to form.
15    THE WITNESS: Yes.
16 BY MR. PETROCELLI:
17    Q   What is it?
18    A   Because I believe that there has been an
19 attempt to portray people who were selling
20 piecework, freelancers who were selling piecework,
21 to portray them as staff people.
22    Q   What does "staff people" mean?
23    A   People who are hired to come in and paid
24 by the week and are working in the office.
25    Q   Is it your understanding that Marvel is

Page 109

1 claiming that these five contributors in this case
2 were staff employees?
3    MR. TOBEROFF: Objection as to form.
4    THE WITNESS: I'm not saying that they are
5 saying it in this particular case, but they have
6 frequently -- when I was a kid, reading Marvel
7 comics and the Bullpen page, I came to the
8 conclusion, as any reasonable person would, that all
9 of these people who wrote under the comics were
10 sitting in the office all day writing and drawing
11 the stuff in what they call the bullpen.
12    And when I talk about -- you know, I
13 mentioned earlier that I frequently correct errors
14 on the Internet about this, this is one of the
15 errors I often correct.
16 BY MR. PETROCELLI:
17    Q   Well, if you would assume, for purpose of my
18 question, that none of these five people was a staff
19 employee, for the purpose of my question here, is --
20 is there any other reason why you would be using the
21 word "purchase" or "sell" other than to distinguish
22 an artist from a staff employee?
23    MR. TOBEROFF: Objection as to form.
24 BY MR. PETROCELLI:
25    Q   Let me rephrase it.

28 (Pages 106 - 109)

Page 114

1    Q   When you say "work with," I don't know --
2  you're changing my -- my words a little bit, so I --
3  I just don't want us to be miscommunicating here.
4       Would -- Larry Lieber was a writer, correct?
5       MR. TOBEROFF:  Objection as to form.
6       THE WITNESS:  Larry Lieber was a writer and
7  an artist.
8  BY MR. PETROCELLI:
9    Q   Okay.  And is it your understanding that
10 Stan Lee would give scripts or plots to Larry Lee --
11 Lieber, his brother, to then go and write?
12      MR. TOBEROFF:  Objection as to form, lacks
13 foundation.
14      THE WITNESS:  At times he would do that.
15 BY MR. PETROCELLI:
16   Q   Okay.  Did he do it generally, or you're
17 saying rarely?
18   A   During some periods generally and some
19 periods rarely.
20   Q   Now, we're talking about -- we're not --
21   A   I'm talking about --
22   Q   -- talking about Rawhide Cowboy [sic], right?
23      We're talking about these Marvel superheroes,
24 right?
25   A   I'm talking everything Marvel published.

Page 115

1    Q   Well, I'm talking about specifically Ant-Man,
2  Iron Man and Thor.
3    A   Okay.  You haven't speci- --
4    Q   Would that change your --
5    A   You haven't specified those before.
6    Q   Okay.  Would that change your answer?
7       And again, the question I'm asking is whether
8  Lieber generally would get plot lines or story lines
9  or -- or some kind of input from Stan before he
10 launched off writing a script for Ant-Man, Iron Man
11 or Thor.
12      MR. TOBEROFF:  Objection as to form.
13      THE WITNESS:  He would get a plot idea from
14 his brother.  In most of those cases, I don't
15 believe the ideas came from Stan, but he would --
16 he would -- he would be given something.
17 BY MR. PETROCELLI:
18   Q   Is it your view that who comes up with the
19 idea bears on the question of work for hire?
20      MR. TOBEROFF:  Objection as to form.  Again,
21 calls for a legal conclusion.
22      THE WITNESS:  Can I have the question one
23 more time, please.
24      (Record read as follows:
25      "Q:  Is it your view that who comes

Page 116

1       up with the idea bears on the
2       question of work for hire?")
3       MR. TOBEROFF:  Objection as to form, calls
4  for legal conclusions from a lay witness.
5       THE WITNESS:  I have no legal opinion on
6  that.  "Work for hire" is a legal term.
7  BY MR. PETROCELLI:
8    Q   Well, I didn't ask for a legal opinion, so
9  let me try again, okay?
10   A   All right.
11   Q   And I'm -- look, the judge is going to decide
12 this case --
13   A   Okay.
14   Q   -- not you or me, okay?
15      You're being put up as an expert witness to
16 assist the Court, if the Court needs such
17 assistance --
18   A   Okay.
19   Q   -- okay?
20      Do you believe, in rendering your opinions in
21 this case, that who comes up with the idea, with
22 respect to these five contributors, somehow bears on
23 the work-for-hire question that's the subject of
24 this case?
25      MR. TOBEROFF:  Objection as to form, calls

Page 117

1  for multiple legal conclusions --
2       THE WITNESS:  I believe I am not --
3       MR. TOBEROFF:  -- and asked and answered.
4       Go ahead.
5       THE WITNESS:  I believe I am not a -- not a
6  lawyer who is conversant with the -- I do not have
7  an opinion in regard to your question as to that
8  situation.
9  BY MR. PETROCELLI:
10   Q   And would you give me the same answer with
11 respect to the question of ownership?
12      So let me rephrase it to you.
13      In rendering your opinions in this case, do
14 you believe that who comes up with the idea for
15 something that's going to be published is pertinent
16 to the issue of who owns that work?
17      MR. TOBEROFF:  Objection as to form --
18      THE WITNESS:  Is it pertinent?
19      MR. TOBEROFF:  -- and, again, calls for a
20 legal conclusion.
21      But you can answer.
22      THE WITNESS:  I, again, do not have an
23 opinion on that.
24 By MR. PETROCELLI:
25   Q   Okay.  Is it true that Stan Lee would

30 (Pages 114 - 117)

1 generally sit down and discuss plots and discuss
2 story lines with artists like Jack Kirby, for
3 example?
4    A  I think --
5       MR. TOBEROFF:  Objection as to form.
6       THE WITNESS:  I believe he very rarely sat
7 down and discussed with Jack Kirby.
8 BY MR. PETROCELLI:
9    Q  Well, I -- I don't -- "sit down" could be
10 literally sit down, or it could mean figuratively
11 sit down.  I just want to be clear.
12       Would he -- would he typically discuss plots
13 and discuss story lines with Kirby who would then go
14 off and -- and draw them?
15       MR. TOBEROFF:  Asked and answered.
16       THE WITNESS:  I believe they did meet on
17 things and talk at times.  I listened in on --
18 Jack's end of one phone conversation with Stan on a
19 story once.
20 BY MR. PETROCELLI:
21    Q  So is the answer to my question that they did
22 typically do that?
23       MR. TOBEROFF:  Objection.  That misstates his
24 testimony.
25       THE WITNESS:  I would not say typically.

1 BY MR. PETROCELLI:
2    Q  Take a look at your deposition in the Kirby
3 case on this point.  I'll -- I'll show you a couple
4 of pages.
5    A  All right.
6    Q  Did you read your Kirby deposition in
7 preparing for your testimony today?
8    A  No.
9    Q  What did you do to prepare?  Anything?
10    A  I read over documents Mr. Toberoff had
11 supplied to me.  I read over my expert reports and
12 Mr. Levitz's expert reports.  And -- and I looked up
13 some dates and things on matters that I thought
14 might be relevant.
15    Q  What dates were those?
16    A  Just -- I'm just trying to guess areas that
17 we might be talking about, and I wanted to make sure
18 that something was within the scope of the dates.  I
19 didn't want to tell you an example that was -- find
20 out later it was 1980.
21    Q  When you gave me some of those broken promise
22 dates --
23    A  Yeah.
24    Q  -- were those some of the dates you looked
25 up?

1    A  Well, no.  The conversation with Steve Ditko
2 I didn't have to look up, because I knew that it
3 was -- the -- the one time I -- I sat in a room with
4 Mr. Ditko and talked -- I -- I was with him for two
5 days.  And that was on a trip that I made in 1970 to
6 New York with my then-partner.
7       We were going -- we attended my very first
8 comic convention, which was the July 4th comic
9 convention of 1970 at the Statler Hilton Hotel
10 and -- so we went back -- we flew back there on the
11 Sunday before and went to DC Comics on Monday.
12       We went to Marvel Comics on Tuesday.  We went
13 to Steve Ditko's office on Wednesday.  We went back
14 to Marvel on Thursday.
15       I remember that week -- that week very
16 vividly, because I was meeting all these people for
17 the first time, all these -- and I met dozens and
18 dozens of people who over the years have written or
19 drawn my favorite comic books.  It was a very
20 memorable week for me --
21    Q  Who --
22    A  -- and that was the only time I ever could
23 have talked to Steve Ditko.
24    Q  Who was your partner?
25    A  My partner, then, was a gentleman named

1 Steve Sherman.
2    Q  Is he still living?
3    A  No.
4    Q  Between 19- -- that was your first time in
5 Marvel, 1970, right?
6    A  Correct.
7    Q  In the offices of Marvel --
8    A  Yes.
9    Q  -- right?
10       And from 1970 to 1975, were there any other
11 occasions that you were in the offices of Marvel --
12    A  I was --
13    Q  -- in New York?
14    A  -- in the offices of Marvel in 1973, '75,
15 '76.
16    Q  In '73 and '75, on -- for how long were you
17 there?
18    A  '73, I was there for two or -- I visited for
19 two or three days, not the entirety of the day, but
20 I went by and hung out, talked to people, chatted
21 with people.
22    Q  At Marvel's office?
23    A  At Marvels's [sic] office -- Marvel's office.
24    Q  You spent two or three days in their offices?
25    A  Yes.

31 (Pages 118 - 121)

1  Q  Okay.
2  A  And then --
3  Q  And then in '75?
4  A  In '75, I spent two weeks in New York, and I
5  kind of spent half of it at DC and half of it at
6  Marvel, sometimes parts of the same day in both
7  places.
8  Q  And what was the reason why in '73 and '75
9  you were spending some time in the offices of
10  Marvel?
11  A  I had a lot of friends there.  I was
12  interested in things.  I had -- in '75, they asked
13  me to do some -- I don't know what the term would
14  be -- help them out with some historical problems
15  they had.
16  Q  Okay.
17  A  And Sol Brodsky, who was the head of
18  production at that time -- I think he had a loftier
19  title than that -- asked me to come up and -- and he
20  wanted to quiz me on things.
21      MR. PETROCELLI:  Let me show you your
22  deposition in Kirby now, which I'll mark as
23  Exhibit 153.
24      (Exhibit 153 was marked for identification
25      and is attached hereto.)

1      THE WITNESS:  Boy, I talked a lot.
2  BY MR. PETROCELLI:
3  Q  And I'll direct your attention to page 92
4  and -- and 93.
5      Want to take a look at that?
6  A  92.
7  Q  And you recall giving a deposition in the
8  Kirby case in 2010?
9  A  Correct.
10  Q  You see, like, starting at line 13 --
11      MR. TOBEROFF:  Before we ask the questions, I
12  would just ask that even though you're directed to a
13  particular page, to understand the context of the
14  question, you may have to read before that page.
15      So I just want to make sure you're not just
16  looking at something out of context.
17  BY MR. PETROCELLI:
18  Q  If you want, you can go back to page 91,
19  because it turns out that this line of question
20  starts after a recess.
21      MR. TOBEROFF:  Where it says (as read):
22      "Videographer:  This is the
23      beginning of disc" --
24      THE WITNESS:  Yes.  I see that, yes.
25      MR. TOBEROFF:  Okay.

1      THE WITNESS:  I'm -- I'm there.
2      Okay.  How far should I go on this?
3  BY MR. PETROCELLI:
4  Q  End of 92, beginning of 93.
5  A  All right.  I think I'm ready.
6  Q  Okay.  So this was about Fantastic Four?
7  A  This is about Fantastic Four #1.
8  Q  Right.
9  A  Mostly.
10  Q  And -- and you agreed with the questioner
11  that Jack Kirby and Stan Lee sat down to discuss the
12  plot and the story line before Kirby actually began
13  to draw the characters, right?
14  A  Correct.
15      MR. TOBEROFF:  Objection as to form.
16  BY MR. PETROCELLI:
17  Q  And you further agreed -- well, I'll -- do
18  you see line 22, page 92 (as read):
19      "Question:  And was it your
20      understanding, with regard to these
21      other characters -- and we can go
22      through all of them, or we can -- or
23      just we can get a general
24      understanding -- that this was
25      typically what was done, that Lee

1      and Kirby would sit down together,
2      discuss the plot, discuss the
3      storyline, and then Kirby would go
4      and draw whatever he was going to
5      draw?
6      "Answer:  Correct."
7      And that was truthful testimony you gave?
8  A  Yes.
9  Q  Okay.  You can put that aside.
10      I'll represent to you that Larry Lieber
11  testified in this case that he wrote the scripts for
12  Iron Man, Thor and Ant-Man all from Stan Lee's
13  plots.
14      Do you have any reason to dispute that?
15  A  Yes.  Whenever I've talked to Larry about
16  that, he has always been very specific to say there
17  were plots that Stan gave to him and he did not
18  understand the point of origin.  He said they may
19  have been from plots that Jack Kirby gave to Stan.
20  Q  Can you take a look at pages 88, 89 and 90 of
21  Larry Lieber's deposition transcript, which I'll
22  share with you.
23  A  If someone will hand it to me.
24      (Exhibit 154 was marked and withdrawn.)
25      MR. TOBEROFF:  Thank you.

32 (Pages 122 - 125)

Page 126

1    THE VIDEOGRAPHER:  I apologize.  This is the
2 videographer.  I've lost connection with the Zoom.
3    Could we go off record to reconnect them?
4    MR. PETROCELLI:  Okay.
5    THE VIDEOGRAPHER:  The time is 12:16 p.m.
6 Off record.
7    (Recess.)
8    THE VIDEOGRAPHER:  The time is 12:22 p.m.
9 We're back on record.
10 BY MR. PETROCELLI:
11    Q   You know, I -- I represented to you what
12 Larry Lieber has testified, which I can show you.  I
13 want to make sure I understand your answer.
14    You mentioned something about Larry told you
15 that Stan wasn't the point of origin.  Is that what
16 you were saying?
17    A   He said he wasn't sure.
18    Q   Okay.
19    A   He did not know the point -- he --
20    Q   What do you mean by --
21    A   Let me -- let me answer.
22    Q   I want you --
23    A   Larry said he --
24    Q   -- to explain what you mean by "point of
25 origin."

Page 127

1    A   Larry said that he was given plot ideas --
2 these -- what we're talking about here is mainly --
3 the story is that -- that appeared in the beginning,
4 the front part, the cover story, for four comic
5 books or five comic books, Tales to Astonish,
6 Strange Tales, Tales of Suspense, Journey Into
7 Mystery and sometimes Amazing Adventures.
8    These are stories that were illustrated by
9 Jack Kirby, working from scripts that were sent to
10 him by Larry Lieber.  Jack maintained that the plots
11 usually came from him, he'd give the plots to Stan,
12 Stan would give the plots to Larry.
13    I asked Larry, the first time I met him,
14 which was in that office visit in 1970, "Is that
15 true?"
16    And he said, "I don't know where the plots
17 came from.  They may have come from Jack."
18    Q   To be clear, though, Lieber got the
19 information from Stan Lee for the plots and the
20 story line?
21    A   Correct.
22    Q   Okay.  And the same would be true for
23 Iron Man, Thor and Ant-Man stories, right?
24    A   I would --
25    MR. TOBEROFF:  Objection as to form.

Page 128

1    THE WITNESS:  I would presume so.
2    MR. PETROCELLI:  Okay.
3    MR. TOBEROFF:  Don't presume.
4    THE WITNESS:  Okay.
5    MR. TOBEROFF:  Don't speculate.
6    THE WITNESS:  However, in the case of some of
7 these -- if you want a complete answer here -- the
8 stories were based on covers.  Sometimes the cover
9 was done first.  And the covers were done by Jack
10 Kirby.  So the point of origin of the story line,
11 particularly if it involved a new character who was
12 first seen on that cover, may have started with
13 Jack.
14 BY MR. PETROCELLI:
15    Q   Is there some significance why you keep
16 pointing out to me that Stan Lee might not have been
17 the original thinker of some idea?
18    A   It's part of the historical record.
19    Q   Okay.
20    A   It's -- it's --
21    Q   Do you see any importance to that piece of
22 the historical record to the question of who owns
23 these works?
24    MR. TOBEROFF:  Objection; calls for a legal
25 conclusion.

Page 129

1    <mark>THE WITNESS:  I am talking as a historian,</mark>
2 <mark>not as a lawyer here.</mark>
3 BY MR. PETROCELLI:
4    Q   Okay.  So in rendering -- rendering opinions
5 in this case, you're not assigning any significance,
6 then, to who came up with a particular idea, in
7 terms of who owns the results at issue here -- the
8 works at issue here?  Excuse me.
9    MR. TOBEROFF:  Objection as to form,
10 misstates testimony.
11    MR. PETROCELLI:  Can you repeat my question?
12    THE WITNESS:  I am not assigning any
13 significance to who came up with the ideas as it
14 relates to -- you know, I assume that that's a
15 separate issue.  The -- the ownership of it has to
16 do with contracts and checks, payments and money and
17 things like that, not with -- Jake Kirby came up
18 with the idea for lots of comic books he never
19 claimed ownership of, in other places.
20 BY MR. PETROCELLI:
21    Q   You agree that people at Marvel, like Stan
22 Lee or Roy Thomas or others who might be involved in
23 editing a comic book, had the ability to take a work
24 created by one of these contributors and make
25 changes to it, correct?

33 (Pages 126 - 129)

Page 154

1  more time, please.
2      (Record read as follows:
3      "Q: Is it true that it was an
4      inconsistent policy, that some
5      checks had occasionally things
6      stamped on them and others, people
7      crossed them out, and that there was
8      no particular firm policy?")
9      MR. TOBEROFF:  Same objection as to form,
10  calls for speculation.
11      THE WITNESS:  I believe that is true.
12  BY MR. PETROCELLI:
13  Q   With respect to your -- your report, you
14  state that (as read):
15      "Comic book publishers did not see
16      any lasting value in their product
17      beyond monthly sales figures."
18      What's the basis of that statement?
19  A   Talking to people throughout the -- the comic
20  book industry for much of my life, hearing people
21  say this stuff is going to be worthless someday.  I
22  mean, it's -- if you want me to give you -- do you
23  want me to give you specific examples?
24  Q   Well, to be clear, Marvin [sic] Goodman never
25  told you this, right?

Page 155

1  A   No.  Martin Goodman.
2  Q   Excuse me, Martin Goodman, correct.
3  A   No.
4  Q   Okay.
5  A   No.
6  Q   Nobody at Marvel ever told you this, right?
7  A   Stan Lee told me that.
8  Q   He told you this, "Comic book publishers did
9  not see any lasting value in their product beyond
10  monthly sales figures"?
11  A   Not -- no, not beyond monthly sale figures.
12  He just, at times, told me that he thought that the
13  business was going to crumble one of these days soon
14  and -- and none of this stuff would be remembered.
15  Q   Is that written down in some of your
16  publications?
17  A   I don't recall.
18  Q   You also said there were no -- (as read):
19      "There was no expectation that it
20      would ever be reprinted and little
21      thought that the characters would be
22      merchandised or exploited in other
23      media."
24      And, again, you're talking about the relevant
25  time period here, right, '62 to '75, in making these

Page 156

1  statements in your report, right?
2  A   I believe I'm talking, in that particular
3  thing, about early in the -- early in the period.
4  Because by the time -- the -- the Batman TV show
5  went on in 1966.  That changed the industry a lot,
6  because people woke up and suddenly decided that
7  characters could be on TV, and they could be on
8  T-shirts and such.
9  Q   And that was 1966, you said?
10  A   '66, I believe, yes.
11  Q   Did anybody at Marvel tell you that there was
12  no expectation that it would ever be reprinted and
13  little thought that the characters would be
14  merchandised or exploited in the media?
15  A   In -- in the mid-'70s, Sol Brodsky told me
16  that that was the attitude when the Marvel superhero
17  books first started in '62 -- '61, actually.
18  Q   And is that written down someplace?
19  A   I don't know.
20  Q   You say in your report that freelance -- that
21  the Marvel method was used by freelance artists to
22  plot and draw comic book stories to reduce costs.
23      MR. TOBEROFF:  What's the question?
24  BY MR. PETROCELLI:
25  Q   Who told you that?

Page 157

1  A   Jack --
2      MR. TOBEROFF:  Object- --
3      THE WITNESS:  I'm sorry.
4      MR. TOBEROFF:  Objection as to form.
5  BY MR. PETROCELLI:
6  Q   Jack Kirby?
7  A   Jack Kirby, Steve Ditko, Don -- I mean, it
8  was kind of an assumption.
9  Q   Well, I'm not asking you about an assumption.
10  A   No, but, I mean, the Marvel method saddled
11  the artist with doing many things, many -- many
12  parts of the process, which at DC Comics would -- a
13  writer would be paid for.
14  Q   I'm just asking whether someone, a person at
15  Marvel, actually told you that the purpose of the
16  Marvel method was to reduce costs.  I'm not asking
17  for your interpretation of it.
18      MR. TOBEROFF:  Objection as to form.
19  BY MR. PETROCELLI:
20  Q   Did you understand my question?
21  A   Yeah.  I think I -- I think I understand your
22  question.
23  Q   And did someone say, oh, we're doing the
24  Marvel method in order to reduce costs?
25      MR. TOBEROFF:  Objection as to form.

40 (Pages 154 - 157)

Page 210

1    I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4     That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were administered an oath; that
8  a record of the proceedings was made by me using
9  machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12     Further, that if the foregoing pertains to the
13  original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript [ ] was [ ] was not requested.
16     I further certify that I am neither financially
17  interested in the action nor a relative or employee
18  of any attorney or any party to this action.
19     IN WITNESS WHEREOF, I have this date subscribed
20  my name.
21
22  Dated: March 20, 2023.
23
24  _Nadia Newhart_
     NADIA NEWHART
25     CSR NO. 8714

Page 211

1              ERRATA SHEET
          VERITEXT/NEW YORK REPORTING, LLC
2  CASE NAME: Marvel Characters, INC Et Al v. Lawrence D.
   Lieber, Et Al.
3  DATE OF DEPOSITION: 3/3/2023
   WITNESSES' NAME: Mark Evanier
4
5  PAGE  LINE (S)    CHANGE        REASON
6  ___|_____|_____|_____
7  ___|_____|_____|_____
8  ___|_____|_____|_____
9  ___|_____|_____|_____
10 ___|_____|_____|_____
11 ___|_____|_____|_____
12 ___|_____|_____|_____
13 ___|_____|_____|_____
14 ___|_____|_____|_____
15 ___|_____|_____|_____
16 ___|_____|_____|_____
17 ___|_____|_____|_____
18 ___|_____|_____|_____
19 ___|_____|_____|_____
20 ___|_____|_____|_____
21  _____
        Mark Evanier
22  SUBSCRIBED AND SWORN TO BEFORE ME
   THIS ____ DAY OF _____, 20__.
23
24
25  _____       _____
   (NOTARY PUBLIC)     MY COMMISSION EXPIRES:

54 (Pages 210 - 211)